## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHAWN HENNING

            Plaintiff,

   v.

TOWN OF NEW MILFORD; ANDREW OCIF;
SCOTT O'MARA; H. PATRICK
MCCAFFERTY; STEVEN JORDAN; JOSEPH
QUARTIERO; MICHAEL GRAHAM; BRIAN
ACKER; and HENRY LEE,

            Defendants.

No. 3:20-cv-1702

**COMPLAINT AND
JURY DEMAND**

Plaintiff Shawn Henning, by and through his attorneys Craig A. Raabe and W. James Cousins allege as follows:

### PRELIMINARY STATEMENT

1.    Shawn Henning and Ralph ("Ricky") Birch spent 30 years wrongfully incarcerated for the December 2, 1985 murder of Everett Carr— a crime they did not commit.

2.    In December 1985, Ricky and Shawn were troubled and vulnerable teenagers, not sophisticated criminal masterminds.

3.    The idea that they could have committed an exceptionally gory murder while leaving no physical trace of themselves and picking up no physical trace of the victim is absurd. It has always been absurd.

4.    Police learned of the death of Everett Carr at his home in New Milford, Connecticut, in the early morning hours of December 2, 1985.

5.     When they arrived, they found one of the bloodiest crime scenes they had ever encountered.

6.     There was blood on the floor, blood on the walls almost all the way up to the ceiling, blood on the victim's clothes, and blood scattered around the house on objects that the killers touched.

7.     None of it was Ricky Birch or Shawn Henning's blood.

8.     The killers left bloody footprints at the scene. According to the State, the footprints must have been left during the struggle, and could not have been left by someone who came upon the scene afterwards, because other blood spattered on top of the footprints.

9.     The footprints were not Ricky Birch's or Shawn Henning's. They were too small.

10.     The crime scene was rich with fingerprints. The police lifted at least 40 latent fingerprints from the scene and compared them against 50 known individuals.

11.     None of the fingerprints belonged to Ricky Birch or Shawn Henning. One of the fingerprints has, to this day, not been matched to its source.

12.     Hairs were recovered from the crime scene.

13.     None of the hairs belonged to Ricky Birch or Shawn Henning.

14.     And, as one would expect, the bloody struggle left substantial amounts of DNA at the crime scene.

15.     None of the DNA was Ricky Birch or Shawn Henning's DNA.

16.     The DNA of a still-unknown person was found mixed with the blood and DNA of the victim, on the victim's clothing, on a piece of the murder weapon, in a bloody footprint on the floor, and in a blood smear on box in the victim's dresser.

17.     No physical trace of the victim has ever been found on the person of Ricky Birch or Shawn Henning or on any items that were ever in their possession.

18.     At the time of Carr's death, Ricky was just 18 years old. Shawn was 17.

19.     Ricky and Shawn were homeless, sleeping in a stolen car, and carrying around the few possessions they owned. They were inexperienced in life, poor, and dirty.

20.     The police thoroughly searched Ricky and Shawn's bodies, their clothing, their property, the car, and the area where they abandoned the stolen car. None of Carr's blood, hair, or DNA was ever found in any of those places, nor was any other forensic evidence from the scene of the murder.

21.     While the police quickly and blindly considered Ricky and Shawn as suspects, they knew they had no evidence to charge Ricky and Shawn with the gruesome crime.

22.     The police had no eyewitnesses connecting Ricky or Shawn to the murder scene.  They had no forensic or physical evidence from a dynamic and horrific crime scene that surely left an evidentiary trail to the true killers. The police had no explanation as to how a couple of homeless teenagers could have committed the Carr murder and left no trace at one of the bloodiest crime scenes in recent memory.

23.     In the words of the commanding officers who supervised the investigation, the police did not have "sufficient probable cause" to arrest or charge Ricky or Shawn.

24.     But, as the case remained unsolved, the pressure mounted. The police needed someone to take the fall for the murder of Everett Carr. They chose Ricky Birch and Shawn Henning.

25.      The police falsely claimed that Ricky had incriminated himself in a police interview—even though the supposed incriminating remark was nowhere to be found in

the police reports and was not doctored up for more than a year.

26.   The police fabricated reports that Shawn had made statements that put him at the crime scene and they wrongly manipulated Shawn's grandmother and teenage friend into offering inculpatory statements.

27.   The police suppressed evidence that was starkly inconsistent with their implausible theory of the case.

28.   In an effort to explain away the lack of physical evidence, famed criminalist, Henry Lee, falsely claimed that he had tested a towel at the scene and it tested positive for blood.  In fact, according to testimony from state forensic lab personnel, Lee never tested the towel. When the lab finally did test the towel in connection with Shawn's successful *habeas corpus* proceedings decades later, the towel did not contain blood.  To convict Shawn, the State had argued to the jury the false evidence that Lee manufactured when it claimed that Shawn had used the towel to wash off Carr's blood.

29.   These misdeeds stole almost half of Shawn Henning's adult life from him and have left him with the enduring emotional trauma from waking up in prison every day for thirty years for a crime with which he had absolutely no involvement.

## JURISDICTION AND VENUE

30.   This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and allege the deprivation of rights guaranteed by the Constitution of the United States.

31.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     Venue lies in this Court under 28 U.S.C. 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Connecticut.

## JURY DEMAND

33.     Plaintiff demands trial by jury.

## PARTIES

34.     Plaintiff Shawn Henning is a 52-year-old man. He is a citizen of the United States and resides in New London, Connecticut.

35.     Defendant Town of New Milford is a municipal corporation organized under the laws of the State of Connecticut, with its principal place of business at 10 Main Street, New Milford, Connecticut.

36.     Defendant Andrew Ocif was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

37.     Defendant Scott O'Mara was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

38.     Defendant H. Patrick McCafferty was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

39.     Defendant Steven Jordan was at all relevant times a Police Officer in the New Milford Police Department, acting under color of state law. He is sued in his individual capacity.

40.     Defendant Joseph Quartiero was at all relevant times a Detective in the Connecticut State Police acting under color of state law. He is sued in his individual capacity.

41.     Defendant Michael Graham was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

42.     Defendant Brian Acker was at all relevant times a Sergeant in the Connecticut State Police, acting under color of state law.  Acker is the highest-ranking police official assigned to the Everett Carr murder investigation and, upon information and belief, retained supervisory authority over the investigation as a whole. He is sued in his individual capacity.

43.     Defendant Henry Lee was at all relevant times the Chief Criminalist and Director of the Connecticut State Police Forensic Laboratory, acting under color of state law. He is sued in his individual capacity.

**FACTS**

**I.     The Gruesome Murder of Everett "Charlie" Carr**

**A.  *Blood Everywhere***

44.     On the night of December 1-2, 1985, at least two people murdered 65-year-old Everett "Charlie" Carr at the home of his daughter Evelyn Kominiak, a.k.a. Diana Columbo, at 74 Aspetuck Avenue in New Milford, Connecticut.

45.     Carr was stabbed approximately 27 times, including a deep five-inch gash across his neck. His jugular vein was severed. He sustained approximately seven instances of blunt force trauma to the head.

46.     The murder weapon has never been recovered. A metal collar that connected the blade of the murder weapon to the handle was found under Carr's body.

47.     Blood was pooled around Carr's body and splattered and smeared on the walls of the Columbo home's front hallway, reaching or nearly reaching the ceiling.

48.     The blood trail showed that, after the assault on Carr, the assailants did not immediately leave the house.

49.     Rather, they rummaged through a few other areas of the house, including most notably, the dresser in Carr's bedroom. One of the assailants dripped Carr's blood onto the clothes in a drawer of that dresser and smeared blood on a White Owl cigar box in the drawer.

50.     Neither Ricky Birch nor Shawn Henning was involved in Carr's death in any way.

51.     Neither Ricky Birch nor Shawn Henning has ever been inside the home at 74 Aspetuck Avenue.

52.     Ricky Birch and Shawn Henning are, and always have been, entirely innocent of this crime. Carr's true killers remain unknown and have never been brought to justice.

### B. Diana Columbo's Suspicious Behavior

53.     Diana Columbo called for emergency assistance for her father at approximately 4:50 am on the morning of December 2, 1985.

54.     During that call, she said to the dispatcher, "Oh my God, he's got a knife in his hand."

55.     When emergency medical personnel arrived at 74 Aspetuck Avenue, they entered the house through the kitchen.

7

56.     When one of the EMTs tried to push through a swinging door from the kitchen to the dining room to go speak with Columbo, she found that the door was barricaded.

57.     But Columbo had just walked through the door, unobstructed, moments earlier.

58.     After entering the dining room, Columbo pushed furniture against the door to prevent the police from opening it.

59.     During a conversation with an EMT at the crime scene, Columbo blurted out, "Why did he do this?"

60.     While still at the scene, Columbo later returned to the dining room to retrieve her fur coat; an EMT noted this fact in his report because he found it strange.

61.     Ms. Columbo provided widely divergent and irreconcilable stories of how and when she discovered her father's body.

62.     When she spoke with police at the scene, Columbo told them that she had been home all night and heard her father "coughing" but did not check on him. This was a lie. Columbo had in fact been at the home of a boyfriend for much of the night.

63.     The next day, Columbo acknowledged that she had lied and told police she had been at the boyfriend's house. This time she told police that she left her boyfriend's house and arrived home at 2:30 a.m. or 3:00 a.m.

64.      In a sworn statement to police on December 3, Columbo gave her final version, claiming that she returned home at 4:30 a.m. on the morning of December 2. When she found her father, she "thought he had hemorrhaged and pas[sed] out." She knelt by him and "told him I was going to help him up."

65.     Ms. Columbo claimed she "felt his hand and wrist and told him to move his hand to get his blood circulating." When he did not do so, she became concerned.

66.     These statements were facially absurd. When Columbo purportedly came home, the lights were on, the floor and walls of her hallway were covered in blood, and her father was lying face-up on the ground, completely soaked in blood, with a five-inch gash in his throat and dozens of stab wounds in his torso. He quite clearly had been brutally murdered and had not "pass[ed] out." Nothing "was going to help him up."

67.     Columbo's statement that her father "hemorrhaged" and that she thought she could help her father get up by moving his hand is farcical and would have led any reasonable law enforcement officer to understand that Columbo was involved in or had knowledge about her father's gruesome murder.

68.     Similarly, although there was blood smeared and splattered all over the hallway and walls, Columbo also told police that it did not appear there had been a struggle in the house. No reasonable person would have believed such nonsense.

69.     The time at which Columbo claimed she came home from the boyfriend's house varied, but was in all events no later than 4:30 a.m.

70.     Columbo did not call for emergency medical assistance until 4:50 a.m.

71.     Columbo's delay of at least 20 minutes in seeking help is equally inexplicable and incriminating.

72.     The gravity of the situation was readily apparent—as was the possibility that the assailants might still be in the house, unless of course Columbo knew who they were.

73.     Screaming, running away, or immediately calling police are all predictable, innocent responses to discovering one's father gruesomely murdered in one's home.

Hanging around for at least 20 minutes, lying to the police, claiming it was a "hemorrhage," and barricading emergency personnel from a room of the house are not.

74.     What's more, immediately after calling for medical assistance on the night of the murder, Columbo called Richard Burkhart, her employer and lover.

75.     Columbo was a senior manager of Burkart's radiological equipment company, Burkhart-Roentgen. She was also his paramour for many years while Burkhart was married to someone else.

76.     Carr, the victim, also worked part-time in the shipping department at Burkhart-Roentgen and did not approve of his daughter's affair with Burkhart.

77.     Burkhart claimed that his car would not start upon receiving Columbo's call, so he did not drive it to the crime scene where the police were present.  Instead, in the wee hours he called an employee to drive him to Columbo's house at 74 Aspetuck Avenue.

78.     Interestingly, the purportedly broken car was back in working order the very next day.

79.     Burkhart also called one of his sons at 5:00 a.m. and asked him to come from Portchester, New York to Columbo's house in New Milford to "help clean up the blood" and telling his son, ridiculously, that Mr. Carr may have "coughed up his lungs."

80.     Burkhart told police that Columbo told him that she had been home during the night and heard a thud downstairs, which she later discovered was her father.

81.     Burkhart and Columbo both falsely told police that Burkhart and the victim had a close, friendly relationship.

82.     In fact, as numerous witnesses told police, Burkhart and Everett Carr loathed each other.

83.     Exculpatory police notes that were not disclosed to the defense before trial describe Carr's feelings toward Burkhart as follows: "[F]ather said I hate that SOB before I leave I'm going to punch that bastard."

84.     On the afternoon after the murder, a Burkhart-Roentgen employee visited Burkhart's farm and noticed unexplained scratches on Burkhart's face and neck.

### C. An Inside Job?

85.     From the moment he became involved in the investigation, the lead investigator, Connecticut State Police ("CSP") Detective Andrew Ocif, conducted the investigation on the implausible premise that the killing of Everett Carr was a "burglary gone bad."

86.     However, in addition to the suspicious behavior of the victim's daughter, there were any number of reasons to doubt—from the very beginning of the investigation—the implausible "burglary gone bad" premise.

87.     First, the exceptional savagery of the crime itself. The number and severity of the wounds were more consistent with an attack committed in a fit of rage out of personal animosity than a burglary committed by someone seeking to avoid detection.

88.     Second, the theft, or lack thereof. Few items were reported missing from the home:  a VCR, a few pieces of jewelry with little value, and some rolls of quarters.

89.     But the house was full of televisions, stereos, candlesticks, and antiques that were not touched. The victim had $67 in cash, a watch, and a gold wedding ring on his person, none of which were taken.

90.     In addition, as the police knew but failed to disclose to Mr. Birch's or Mr. Henning's defense counsel, investigators seized $1,000 in cash from the crime scene, further undermining the burglary-gone-wrong theory.

91.     The assailants thoroughly searched Carr's dresser, as if looking for something in particular.

92.     The only room in the house that the attackers did not disturb in any way was Diana Columbo's bedroom.

93.     The only thing of even marginal value taken from the house—the VCR—had been a gift from Richard Burkhart to Diana Columbo.

94.     Third, the dogs. Diana Columbo had four dogs in the house that were known by neighbors to bark very loudly at any stranger and to act aggressively toward perceived threats.

95.     The dogs did not bark on the night of the murder. Neighbors familiar with the sound of Columbo's dogs said they did not hear them that night, suggesting that whoever killed Carr was known to the dogs.  The dogs had never seen Shawn or Ricky.

96.     The dogs were familiar with Burkhart, as he had bred them and given them to Columbo.

97.     None of the dogs was harmed in the incident in any way.

98.     Fourth, the guns. Carr was known to own multiple firearms, including one he regularly kept in the glove compartment of his Pontiac, which he generally kept unlocked.

99.     No firearms were found at the crime scene. The glove compartment of Carr's Pontiac was found open. No gun was inside.

100.    Carr's missing guns demonstrate that his assailants were familiar with him and took measures to deprive him of known means of self-defense before attacking him.

101.    Fifth, the timing. Carr and his wife Evelyn had lived with their daughter Diana Columbo in New Milford for several years. They were scheduled to move into a new apartment in New Jersey on December 3, 1985.

102.    On the night of the murder, December 1-2, 1985, Mrs. Carr was already in New Jersey making preparations for the move.

103.    If someone wanted to kill Carr before he left New Milford and while his wife was not there, the night of December 1-2, 1985 was an opportune time to do so.

## II. Defendants' Investigation Yields "Not Enough Probable Cause"

### A. *The Usual Suspects For A Supposed "Burglary Gone Bad"*

104.    Because the crime occurred in New Milford, the New Milford Police Department (NMPD) responded to the crime scene and initially took charge of the investigation.

105.    New Milford had a population of less than 25,000 at the time and a small police department.

106.    The Western District Major Crime Squad of the Connecticut State Police (CSP) soon began providing assistance.

107.    Throughout the investigation, the CSP and NMPD jointly investigated the murder.

108.    Some investigative tasks were performed exclusively by NMPD personnel; some exclusively by CSP personnel; and some by both CSP and NMPD personnel.

109.    The lead investigator on the case was CSP Detective Andrew Ocif.

110.    On the morning of December 2, 1985, just hours after police responded to the scene of the Carr murder, NMPD Police Officer Steve Jordan was in contact with a

local informant, Peter Barrett. Jordan asked Barrett who was committing burglaries and stealing VCRs.

111.    Barrett revealed the names of several people who were committing small-time burglaries in the area, all of whom were drug users.

112.    Barrett also revealed the identities of two "fences" who were receiving stolen property for resale in return for money or drugs. One of the fences was a man named Douglas Stanley, who lived in Danbury and sold cocaine out of his apartment.

113.    Police began investigating the people whom Barrett mentioned, including Stanley, for whose apartment they got a search warrant.

114.    Most of the early persons of interest in the investigation were people with addiction issues, transients, and low-level offenders known to local police.

115.    In the two to three days following the murder, police canvassed Carr's neighborhood to see whether neighbors heard anything unusual on the night of the murder.

116.    Most reported hearing and seeing nothing of interest. But at least one neighbor said that she heard a car with a loud exhaust drive up the street at approximately 12:20 to 12:30 a.m., and then turn around and depart the area approximately 15 to 20 minutes later.

### B.  Ricky, Shawn, Tina, and the Stolen Buick

117.    Among the people mentioned by the informant as someone who used recreational drugs and committed small-time burglaries in New Milford in December 1985 were Ricky Birch and Shawn Henning.

118.    Shawn had suffered through an extremely chaotic home life from the time he was a young boy. He, his siblings, and half siblings were, from time to time, separated

and living with different relatives in a variety of locations. Shawn had lived with his mother, then his aunt, and then his grandmother as the family broke apart from divorces, illness, and poverty as family members lurched from place to place (*e.g.*, Illinois, California, Oklahoma, New Mexico, and Colorado).

119.    By age sixteen, Shawn had been sent to live with his father in New Milford, Connecticut. But his father, a bouncer in a strip club, had no interest in caring for Shawn and had, by September 1985, thrown him out to live on the street.

120.    In September 1985, shortly after his 17th birthday, Shawn met his girlfriend, Tina Yablonski, in New Milford.  She was a childhood friend of Ricky Birch.

121.    The three of them began to hang out together.

122.    In December 1985, Ricky was homeless. He generally slept in a park, at a friend's house, or in a car if he had access to one. He carried around a few extra items of clothing in a backpack.

123.    In December 1985, Ricky was also regularly using cocaine. On a few occasions, he broke into houses he knew to be empty at the time and stole electronics and other household items. He then sold those items, including to Douglas Stanley, to pay for drugs.

124.    On November 29, 1985, Ricky Birch, Shawn Henning, and Tina Yablonski, stole an old Buick from the lot of an auto body shop in Brookfield, Connecticut. They stole the car so that Ricky would have somewhere to sleep.

125.    They drove the Buick to New Hampshire to visit Ricky's mother.

126.    While they were in New Hampshire, the Buick got stuck in a stream in bad weather. In the process of pulling it out, its muffler ripped off. As a result, the Buick was very loud.

127.    On the night of December 1, 1985, upon returning from New Hampshire, Ricky, Shawn, and Tina drove to Douglas Stanley's apartment in Danbury, where they hung out and got high.

128.    They left in the early morning hours of December 2 and dropped Tina at her home in New Milford. They then returned to Shawn Henning's father's house, where Ricky slept on the floor of Shawn's room. They had to sneak into the house as Shawn's father had thrown him out to live on the street.

129.    Ricky, Shawn, and Tina returned to Douglas Stanley's apartment late on December 2. Barrett, the informant, was there, as were other local burglars whose names Barrett had given to police, including a man named Keith Breen.

130.    Barrett and Breen told the group that an old man in New Milford had been killed when he interrupted a burglary and had his throat slashed with a knife. Stanley told everyone assembled at his apartment to expect to be questioned by the police.

131.    Ricky, Shawn, and Tina decided that, if questioned by the police, they would say they had hitchhiked from New Hampshire to Danbury, and then from Danbury to New Milford, on the night of December 1-2. Their purpose in doing so was to conceal that they had stolen the Buick.

132.    The police questioned Shawn Henning on December 4. He told the police that he, Ricky, and Tina had left Douglas Stanley's around 12:30 am on the night of December 1-2 and hitchhiked back to New Milford. Shawn denied any knowledge of or involvement in the Carr homicide.

133.    On December 5, Ricky voluntarily walked into NMPD headquarters to speak with police after hearing from an acquaintance that the police had identified Ricky as an informant.

134.     When Ricky showed up, police questioned him about his whereabouts on the night of December 1-2. He said that he, Shawn, and Tina had left Douglas Stanley's between 12:30 am and 2:00 am on the night of December 1-2 and hitchhiked back to New Milford. Ricky denied any knowledge of or involvement in the Carr homicide.

135.     The police had learned through investigation that the Buick had been stolen from the auto body shop but did not know who had taken it. When police asked Ricky about the Buick, he admitted stealing it. He also acknowledged having committed four recent residential burglaries in the area.

136.     Ricky offered to take the police to the Buick. It was not where Ricky had last left it, but while Ricky was in the patrol car with the NMPD, they coincidentally passed Shawn walking on the street.

137.     Ricky told Shawn that he had told the police everything about the Buick and that Shawn should do the same. Shawn then took the police to the Buick, which he had left in the woods near a reservoir.

138.     On December 5, police separately interrogated Ricky and Shawn a second time. This time, they were in custody.

139.     Each man continued to deny any knowledge of or involvement in the Carr homicide. Each truthfully maintained that they had left Douglas Stanley's apartment in Danbury in the early morning hours of December 2, dropped off Tina at her house, and returned to Shawn's father's house, where they slept.

140.     The police seized the clothes that Shawn and Ricky were wearing when they were arrested.

141.     After recovering the Buick, the police thoroughly searched it. It was predictably filthy—full of trash, clothes, dust, and dirt. It had clearly not been cleaned

for some time. The police knew from multiple witnesses that Ricky and Shawn had slept multiple nights in the Buick.

142.    The police painstakingly inventoried every single object in the Buick—more than a hundred items altogether.

143.    The items included matchbooks, pieces of paper, forks, tissues, an empty soda cup, soap, clothing, a Motley Crue poster, gasoline cans, marijuana, a single penny, and an empty mayonnaise jar "partially filled with Hawaiian Punch-type liquid."

144.    None of the items found in the Buick had any connection to 74 Aspetuck Avenue or to the Carr homicide.

145.    On December 9, police again conducted custodial interrogations of Shawn and Ricky, who were detained pending trial on charges relating to the stolen Buick. The December 9 interrogation of Ricky would later become a pivotal moment in the case against him.

146.    The police exerted significant pressure on the teenage suspects during those interrogations. They threatened them with the death penalty, shoved graphic photos of Carr's slit throat in their faces, and encouraged each man to turn on the other.

147.    Both truthfully maintained that they had nothing to do with the murder of Everett Carr.

148.    These detectives, who had knowledge of the crime scene, correctly recognized that whoever committed this crime would have "blood on their person" and would leave a trail of forensic evidence into the getaway car. Shawn vociferously pleaded with the police to carefully examine the crime scene evidence, the car, and his clothing, because he knew he had not been present at the crime.

149.     The police threatened Shawn that he faced "heavy time," "that all the evidence points toward [Shawn]," that it was a "rich crime scene," and "that evidence that we've got from you and from the scene is going to put you there." They also lied to Shawn, claiming that his "story doesn't match up with Birch's" and Mr. Birch was "gonna put it all on [Mr. Henning]" and "Birch is gonna walk out of this thing and guess who's gonna be left sitting, holding the bag. Shawn Henning."

150.     During Ricky's December 9 interrogation, CSP Detective Scott O'Mara held a graphic photo of Carr's dead body a few inches from Ricky's face. O'Mara yelled, in sum and substance, "Look what you did to someone's grandfather. How can you live with yourself?"

151.     Ricky responded, in sum and substance, "If you don't get that photo out of my face, I'm going to punch you in yours." At that point, the police ended the interrogation.

152.      As more particularly described hereafter, Defendants O'Mara and McCafferty created false reports of Shawn's interrogations.

153.     Also on December 9, the police executed search warrants for the Henning residence, the Yablonski residence, and the bodies of Ricky, Shawn, and Tina.

154.     The police took clothes from Shawn and Tina's houses. They took lint from Shawn's father's dryer. They took samples of Ricky, Shawn, and Tina's fingerprints, blood, hair, and pubic hair.

155.     None of Carr's blood was found in or near the stolen Buick, or on Ricky, Shawn, or Tina's persons or property.

156.     There were small blood spots on some clothes belonging to Ricky and Shawn, but it had nothing to do with the Carr murder.  The blood was Shawn's from

19

when he cut his finger while removing a license plate from the Buick, which lab testing confirmed.

157.    As the State Lab reported to the police in January 1986, none of the latent fingerprints lifted from the Carr crime scene belonged to Ricky, Shawn, or Tina.

158.    As the State Lab reported to the police in February 1986, none of the blood found at the Carr crime scene belonged to Ricky, Shawn, or Tina.

159.    None of the hair found at the Carr crime scene belonged to Ricky, Shawn, or Tina.

160.    The footprints at the Carr crime scene did not match the footwear seized from Ricky and Shawn.

161.    In short, within two months of their initial contact with Ricky and Shawn, the police knew that no physical evidence whatsoever connected either of them to the Carr homicide.

### C. The Investigation Flails

162.    In March 1986, the police learned that Douglas Stanley had bought a stolen Panasonic VCR from Ricky Birch and then resold it. The VCR taken from the Columbo house at 74 Aspetuck Avenue was also a Panasonic.

163.    Police tracked down the VCR that Ricky had sold to Douglas Stanley. To their evident disappointment, however, it had no connection to the Carr homicide. It came from a different house in a different town.

164.    Between January and October of 1986, the police searched the road between 74 Aspetuck Avenue and the reservoir area (where Shawn had led the police to the Buick). They had dogs sniff the woods for blood. They had divers search the reservoir. They went back to 74 Aspetuck Avenue to dust for more fingerprints.

165.    They found nothing connecting Ricky or Shawn to the Carr murder.

166.    Even as they pursued tangential leads, the police scarcely investigated obvious suspects, Diana Columbo and Richard Burkhart.

167.    In May 1986, a CSP trooper who was not involved in the Carr investigation received a phone call at home from an anonymous caller who said that Richard Burkhart was responsible for the Carr homicide.

168.    On June 9, 1986, Ocif asked Burkhart to take a polygraph test about his whereabouts on the night of Everett Carr's death. Burkhart became enraged, yelled "No fucking way," kicked over a wastebasket, and told Ocif to "get the hell out of here and never come back."

169.    Ocif complied with Burkhart's suspicious outrage:  Ocif left and never came back. He made no attempt to speak with Burkhart again.

170.    Police knew that both Burkhart and Columbo had repeatedly lied about the relationship between Burkhart and Everett Carr. Burkhart and Columbo claimed the two men were friendly when they actually hated each other. Police do not appear to have ever confronted either Burkhart or Columbo about these lies.

171.    Despite having been informed that Burkhart owed Carr money, police do not appear to have investigated the financial relationship between the two men.

172.    Police also appear to have been unaware that Columbo was using illicit drugs heavily at the time of Carr's death.

173.    Police do not appear to have investigated the fact that Columbo's primary car, a white Volkswagen Beetle, was not parked at her home on the night of the murder.

### D. With Pressure Mounting, the Police Admit They Cannot Solve the Crime

174.    Everett Carr was a senior citizen killed in especially brutal fashion in what the police claimed was a botched burglary. The case attracted significant public attention in Western Connecticut. The police were under significant pressure to solve it.

175.    Some of that pressure came from the victim's family. On May 11, 1986, Carr's widow Evelyn wrote to CSP Sergeant Brian Acker to express her displeasure that no one had been arrested yet.

176.    Evelyn, who by then lived in New Jersey, asked the police to tell her if they were still "at first base." She wrote: "I still have many friends in New Milford, and I feel obliged to let them know by advising these friends and doing so through the public media, i.e., press conferences, TV, interviews, etc."

177.    She copied the Governor of Connecticut on the letter.

178.    On October 9, 1986, CSP Lieutenant James Hiltz, the Commander of the Western District Major Crime Squad, encouraged the State's Attorney's Office to seek authorization from the Governor to issue a monetary reward.

179.    Lt. Hiltz wrote to the State's Attorney: "[A]ll conventional investigative leads and processes have been exhausted. All known associates, friends, possible witnesses and/or suspects have been interviewed. Evidence has been collected and forensically examined and analyzed. Simply stated, there is **not enough Probable Cause for an arrest or prosecution**."

180.    Lt. Hiltz's representations were true. On information and belief, he would not have made such representations to the State's Attorney without familiarizing himself with the investigation or without consulting the lead detective, Ocif.

181.    The Governor authorized a $20,000 reward on October 23, 1986. CSP investigators working on the case learned of the award on October 28, 1986, when the State's Attorney informed them of it.

182.    Ocif personally learned of the reward—and of Lt. Hiltz's representation that no probable cause existed—no later than March 5, 1987, when Ocif attached Lt. Hiltz's letter to a memo that Ocif wrote and signed.

183.    On information and belief, Ocif never questioned, challenged, or disputed Lt. Hiltz's representation that no probable cause existed. To the contrary, Ocif agreed with it.

184.    The reward did not bear any fruit. The finger-pointing began.

185.    On February 17, 1987, State's Attorney Pastore wrote to Henry Lee at the State Lab: "The commanding officer of the Western District Major Crime Squad . . . has requested that this office intervene with your office to expediate [*sic*] the complete analysis of blood stains to clothing submitted to you in [the Carr case]. I expressed reservations to the officers in as much as their frustrations are within their own agency however [*sic*] I did want to advise you of their request."

186.    In other words, Lt. Hiltz, the commanding officer of the Western District Major Crime Squad, blamed the State Lab for not having solved the Carr case. But the State's Attorney told Lt. Hiltz that the real blame lay "within their own agency"—that is, with the CSP investigators working the case.

187.    On February 26, 1987, Lee responded. He wrote: "We started the examination of the evidence right away. I treated this case as the top priority case. Five examiners and myself worked on this case day and night for four weeks, including several weekends . . . . We have done everything within our available resources on this

case. However, forensic science has its limitations. The bloodstain found on the suspect's jacket didn't match the victim's blood type."

188.    Lee noted that he had reached out to several other laboratories for assistance with the Carr homicide but "they inform me that there is really not much that they can do to help us with this case."

189.    In conclusion, Lee wrote: "If a case cannot be solved, it is not the fault of any particular individual."

190.    On March 5, 1987, Major John M. Watson, the commander of the entire CSP Western District and the supervisor of Lt. Hiltz, wrote a letter to Evelyn Carr, who was continuing her efforts to press for an arrest.

191.    Watson wrote: "I do understand your frustrations regarding this tragic occurrence in your life. Suspects have been identified but sufficient ***probable cause does not exist at this time to proceed against them***."

192.    Major Watson's representation was true. On information and belief, Watson would not have made such a representation (particularly not to the victim's widow) without familiarizing himself with the details of the investigation or without consulting the lead detective, Ocif.

193.    On information and belief, Ocif never questioned, challenged, or disputed Major Watson's representation that no probable cause existed. To the contrary, Ocif agreed with it.

194.    In short, as of March 1987, the investigation was at a dead end. No one agreed who was responsible for the lack of progress. The State's Attorney blamed the CSP. The CSP blamed the State Lab. The State Lab blamed the limits of science.

195.    But everyone agreed on the problem: There was no probable cause for an arrest. It looked like the Carr case might never be solved.

## III. Defendants Manufacture the Evidence They Were Lacking and Suppress Evidence That Contradicts Their Fabricated Narrative

196.    Knowing that they lacked any basis for an arrest, and facing increasing pressure, Defendants set out to "solve" the Carr homicide by creating the evidence they were missing. Their targets were Ricky Birch and Shawn Henning.

197.    Defendants targeted Ricky and Shawn because they were out of other ideas.

198.    Defendants targeted Ricky and Shawn because they could fit them into their "burglary gone bad" narrative; even though the narrative was facially implausible.

199.    Above all else, Defendants targeted Ricky and Shawn because they were easy targets—young, uneducated, poor and adrift.

### A. The Bathroom Fabrication

200.    On April 3, 1987—just weeks after CSP commanding officers repeatedly represented that no probable cause existed for an arrest and the State's Attorney blamed the CSP investigators on the case for the lack of progress—those CSP investigators retrospectively altered Ricky Birch's words to create an incriminating statement that Ricky never made.

201.    As discussed above, CSP Sergeant John Mucherino and Detective Scott O'Mara had conducted a custodial interrogation of Ricky on December 9, 1985.

202.    Among the aggressive tactics Mucherino and O'Mara used in that interrogation was to shove graphic photos of Everett Carr's dead body in Ricky's face and ask Ricky how he could live with himself after killing someone's grandfather. The

interrogation terminated when Ricky said he would "punch" O'Mara if O'Mara did not get the photo out of his face.

203.    Throughout the December 9 interrogation, Ricky maintained his innocence.

204.    On April 3, 1987, O'Mara wrote a memo indicating that he and Mucherino had "reviewed" their December 9, 1985 interrogation with Ricky. O'Mara and Mucherino both now "remembered" that, sixteen months earlier, Ricky said "That's the bathroom there" while looking at a photo of Carr's body lying in a pool of blood in the hallway.

205.    According to O'Mara and Mucherino, the photo did not show any portion of the bathroom. Therefore, according to O'Mara and Mucherino, Ricky's statement revealed knowledge of the house's layout that Ricky could only have gained from being inside the house.

206.    This alleged inculpatory statement about the bathroom was an utter fabrication.

207.    It is nowhere to be found in O'Mara's contemporaneous report of the December 9, 1985 interrogation.

208.    O'Mara's April 3, 1987 fabricated report states that Mucherino "previously had a conversation with . . . Ocif" in which Mucherino told Ocif about the statement.

209.    No contemporaneous record of that purported conversation between Mucherino and Ocif exists either. It never occurred.

210.    Ricky never said "That's the bathroom there," in words or substance, during his December 9, 1985 interrogation.

211.    Nor did Ricky make any other such statement during the December 9 interrogation demonstrating that he had non-public information about the layout of the house at 74 Aspetuck Avenue. He had no such knowledge, having never been inside the house.

212.    O'Mara, Mucherino, and Ocif made the whole thing up.

213.    O'Mara and Mucherino fabricated other details about the interrogation as well, including that Ricky's entire body convulsed and he nearly fell on the floor when shown a photo of Carr's dead body.

### B. The Tattoo Fabrication

214.    On December 5, 1985, when O'Mara interrogated Shawn at the New Milford police station, O'Mara created a report of the interrogation, falsely claiming that Shawn had, during that interrogation, acknowledged that he knew the victim had tattoos.

215.    The State later relied on O'Mara's fabrication, that O'Mara repeated at trial, to argue that Shawn's supposed knowledge of the tattoos came from his being at the crime scene.

216.    Shawn never said he knew anything about the victim having tattoos. O'Mara simply made this up. Shawn has always accurately maintained that he never met the victim, was never in his house and knew nothing about the murder.

217.    Although the interrogations of Ricky and Shawn were being recorded at the New Milford Police Station on December 5, 1985, no recording or transcription shows this purported statement about the tattoos.

## C. *The "Turning in the Driveway" Fabrication*

218.    On December 9, 1985, Detective Patrick McCafferty conducted an interrogation of Shawn in the Litchfield Correctional Center infirmary where Shawn was being held on pending burglary charges. Shawn had readily admitted to committing several local burglaries. During that interrogation, McCafferty confronted Shawn with the made-up claim that the police knew he had turned around in Everett Carr's driveway. Shawn vehemently denied ever being at the victim's house. During the course of the heated and threatening interrogation, Shawn, in describing a burglary that he, Ricky and Tina had committed in Brookfield, said that they had turned around in the driveway during that Brookfield burglary.

219.    McCafferty then created a false report removing Shawn's reference to the Brookfield location and including instead McCafferty's fabrication that Shawn had admitted he "may have turned around in the *victim's* driveway." McCafferty knew that Shawn had made no such admission.  No recording or transcript exists to support McCafferty's version.

220.     McCafferty repeated that lie at trial and the State relied on it to argue that Shawn admitted being in the driveway at the crime scene.

## D. *The Mildred Henning and Timothy Saathoff Witness Manipulations*

221.    Three days after the homicide, Mr. Henning, while in custody at the Litchfield jail and in between the intense interrogations described above, placed a long-distance call from the jail to his grandmother, Mildred Henning, followed immediately by another call to his friend, Mr. Timothy Saathoff, both in Illinois.

222.    In these calls, he emotionally told them that he had been arrested for burglaries, which he admitted committing, but that he was also being ***accused*** of involvement in a burglary where a man and a dog were killed. He accurately told them that he had no involvement with that crime.

223.    Although the calls were made from the Litchfield jail where, upon information and belief, calls were routinely monitored and/or recorded, the State now denies that recordings exist of the calls. Upon information and belief, Mr. Henning's long-distance calls from the Litchfield jail to Mrs. Henning and Mr. Saathoff were monitored and recorded. Surely, had Mr. Henning said in those conversations what Detective Ocif later claimed he said to Mrs. Henning and to Mr. Saathoff, he would have been arrested for the homicide in December 1985. He was not arrested until 1988.

224.    In August 1987, more than a year and a half after those supposed inculpatory phone calls, Detective Ocif decided to interview Mildred Henning. In his interviews, Detective Ocif falsely represented to Mrs. Henning that he had a "mountain of evidence" that Shawn had been at the crime scene.

225.    Detective Ocif also falsely represented to her that she would "help" Shawn if she said that Mr. Henning had told her that he had been at the murder scene but did not kill Mr. Carr. With this prompting, Mrs. Henning eventually gave an account of an emotional call with Mr. Henning from jail in December 1985 about him committing burglaries, a man being killed, and a dog being killed, and that Mr. Henning said he did not kill anyone.

226.    Detective Ocif told a media source that it took "a lot of convincing" to get Mrs. Henning to provide the account that he wanted.  The "convincing" was nothing but lying and preying on a grandmother's emotional connection to her grandson.

227.    Even still, Detective Ocif did not find Mrs. Henning's statements sufficient probable cause for an arrest as he did not seek a warrant after the interview. Instead, Detective Ocif obtained a violation of probation arrest warrant for Mr. Henning and traveled to Mystic, Connecticut to arrest Mr. Henning, who was working full-time and living at his girlfriend's parents' house.

228.    Detective Ocif used this warrant as a means to take Mr. Henning to the Litchfield state police barracks, where he had prearranged a call with Mrs. Henning in Illinois. Detective Ocif also had prepared a fake warrant for Mr. Henning's arrest for the Carr homicide, with which he confronted Mr. Henning on the drive to Litchfield.

229.    After Shawn arrived at the Litchfield state police barracks, Ocif, by prearrangement, called Shawn's grandmother on the police barrack's phone. Detective Ocif sought to use the ruse of the fake arrest warrant and the surprise call with Mrs. Henning to prompt Shawn to make a self-incriminating statement.

230.    But when Shawn spoke to his grandmother, he again denied any involvement in the Carr homicide. Shawn repeated that he had nothing to do with the Carr murder–that he was not there at all–and that in his prior call he had stated only that he was "accused" of being at the murder. Mrs. Henning simply advised him to tell the truth.

231.    Despite being prearranged, suspiciously, there is no recording of this telephone conversation. Ocif testified that he did not record it. Subsequently, it has been disclosed, however, that police at that barracks regularly recorded, and used, without knowledge or consent of the participants, ***all*** telephone calls made to, from, and within State Police barracks as that was the subject of a federal class action lawsuit (of which Mr. Henning was a plaintiff). *In re State Police Litigation,* 88 F.3d 111 (2d. Cir.1996).

The only fair inference is that the conversation was recorded but not at all inculpatory, so the recording was destroyed.

232.    With no incriminating results from this phone call gambit, Ocif tried another tack:  he falsely told Mr. Henning and his grandmother that he knew Mr. Birch was the murderer. Detective Ocif then tried to urge Mr. Henning into implicating Mr. Birch, with an offer of some form of leniency. But Mr. Henning, even though a short-time acquaintance with no particular loyalty to Mr. Birch, would not be manipulated. Shawn was adamant that neither he nor Ricky had any involvement in the crime.

233.    Detective Ocif also interviewed 20-year-old Timothy Saathoff in Herscher, Illinois in October 1988—almost three years after the homicide and more than a year after he had first interviewed Mrs. Henning.

234.    Mr. Saathoff was a childhood friend of Mr. Henning from when Mr. Henning lived with his grandparents.

235.    In that interview, Detective Ocif falsely represented to Mr. Saathoff that he had substantial evidence that Mr. Henning was at the scene of the homicide, and falsely represented to Mr. Saathoff that he would "help" Mr. Henning if he said that Mr. Henning told him he was at the murder scene but did not kill the man himself.

236.    Having been manipulated by Ocif, just like Mrs. Henning, Mr. Saathoff falsely stated that Mr. Henning had told to him that he was at the scene of the murder, but had not participated in the murder himself.

237.    Mr. Saathoff subsequently came forward in an unscheduled, unsolicited interview with (now Judge) Karen Goodrow and admitted that he lied in his statement and at trial because Ocif told him it would help Mr. Henning if he testified that Mr. Henning was present at the scene but did not commit the murder. Mr. Saathoff

31

confirmed that Mr. Henning never told him that he was present when the man was murdered.

238.    The State relied at trial on these manipulated and fabricated statements, which were obtained by materially false representations to Shawn's grandmother and friend.

### E. Suppressed Exculpatory Evidence

239.    Even with this fabricated evidence—the "bathroom," "tattoo" and "turning in the driveway" statements, and the secondary manipulated "confessions" attributed to Mrs. Henning and Mr. Saathoff—Defendants still had a problem. They had manufactured a case based on a supposed bungled burglary, but their own evidence showed that Everett Carr was almost certainly not killed in a random burglary by people whose motive was to steal from him under the cover of darkness.

240.    To cover up these discrepancies, Defendants withheld material exculpatory evidence from the State's Attorney's Office, preventing that evidence from being disclosed to Ricky, Shawn and their defense counsel.

241.    The Litchfield County State's Attorney's Office had an open file policy in place at the time, under which it made all nonprivileged investigative materials in its possession, including police records, available for inspection by defense counsel.

242.    The suppressed evidence strongly supported the fact that Ricky and Shawn could not have committed the murder of Everett Carr—and that the murder was not a "burglary gone bad" at all.

243.    First, the police withheld the fact that they had recovered $1,000 in cash from the crime scene.

244.    CSP Detective Michael Graham, who helped to process the crime scene at 74 Aspetuck Avenue, found eight $100 bills and four $50 bills at the scene shortly after the homicide. He seized the bills as evidence and filled out an inventory form documenting the seizure.

245.    On December 4, 1985, the NMPD gave the $1,000 in cash back to Diana Columbo, who claimed it as her "lost property." NMPD Detective Steve Jordan filled out a form documenting the return of the $1,000 to Columbo.

246.    CSP Detective Joseph Quartiero documented the recovery of the $1,000 in cash in his handwritten notes from the investigation.

247.    Graham, Jordan, and Quartiero did not disclose any of these documents— or the fact that $1,000 had been recovered from the scene—to the State's Attorney's Office at any time before the start of Mr. Henning's trial.

248.    The recovery of $1,000 in large bills from the crime scene--or nearly $2,400 in today's dollars—lends further support to the theory that the murder of Everett Carr did not occur during a robbery at all.

249.    Second, the police suppressed a recording of a pre-polygraph interview with Tina Yablonski in which she confirmed that Ricky and Shawn could not have been in New Milford at the time the State accused them of being there.

250.    The time at which Ricky, Shawn, and Tina left Douglas Stanley's apartment in Danbury on the night of December 1-2, 1985, was an important detail in the investigation.

251.    If Ricky, Shawn, and Tina left Danbury after approximately midnight, Ricky and Shawn could not have been driving the loud car that a neighbor heard on

Aspetuck Avenue around 12:20 a.m. It would have taken too long to drive back from Danbury, drop off Tina at home, and get to Aspetuck Avenue.

252.    An early morning departure from Danbury would therefore mean that Ricky and Shawn did not commit the crime. (Of course, an earlier departure would not mean that they *did* commit the crime, just that it would have been logistically possible for them to have done so.)

253.    Ricky and Shawn consistently and truthfully maintained that they had left Douglas Stanley's apartment sometime in the early morning hours of December 2.

254.    In a written statement on December 6, Tina told police that she arrived home in New Milford around 1:00 a.m.

255.    On December 8, Tina told police that they left Danbury around 12:50 am.

256.    In June 1986, Tina changed her story. The CSP obtained a letter from a county prosecutor in New Hampshire that promised Tina immunity against prosecution for any role she might have played in a burglary in Charleston, New Hampshire.

257.    Only after Ocif showed her the immunity letter, Tina claimed that she, Ricky, and Shawn had left Douglas Stanley's apartment in Danbury shortly after 11:15 p.m., and certainly before midnight.

258.    Unbeknownst to Ricky, Shawn or their defense lawyers, however, Tina had previously given police *yet another* consistent, exculpatory statement about the time of departure from Danbury.

259.    On March 4, 1986, Tina was administered a polygraph exam by CSP Sergeant Michael Beal and Trooper Joseph Palombizio.

260.    In the interview preceding the polygraph, which was audio recorded, Tina told police that she, Ricky, and Shawn left Danbury at around 12:25 a.m.—much too late

for Shawn and Ricky to have driven the loud car that was heard near Carr's home on the night of the murder.

261.    Beal sent a report on the results of the polygraph examination itself to CSP Sergeant Brian Acker, one of the investigators on the case.

262.    On information and belief, Beal also conveyed either the recording of the pre-polygraph interview, or at least its sum and substance, to Acker and/or other investigators on the case.

263.    Neither Beal, Palombizio, Acker, nor any other police officer disclosed the recording of the March 4, 1986 interview to the State's Attorney's Office.

264.    Neither Beal, Palombizio, Acker, nor any other police officer disclosed the substance of Tina Yablonski's March 4, 1986 statement about the timing of her departure from Danbury to the State's Attorney's Office.

265.    Police also suppressed the immunity letter that Ocif presented to Tina and that provided the motivation for her to change her story.

266.    Third, the police suppressed comprehensive video footage of the crime scene at 74 Aspetuck Avenue.

267.    The footage showed, among other things, that Diana Columbo's bedroom was the only room in the house that was untouched during the purported burglary.

268.    This information, which was not otherwise disclosed to Ricky, Shawn or their defense counsel, further strengthened the inference that this homicide was not a "burglary gone bad" at all.

269.    Fourth, the police suppressed handwritten notes maintained by Detective Quartiero during the investigation of the Carr murder. These notes were never disclosed

to Ricky, Shawn or their defense counsel at the time he was accused of and tried for the murder.

270.    Quartiero's notes contained a trove of exculpatory information.

271.    The notes documented that police found $1,000 in cash at the crime scene, as well as a long list of jewelry with a total value of approximately $10,000, undermining the State's trial theory that the murder occurred during a robbery.

272.    The notes documented that Diana Columbo told investigators there were no signs of a struggle at the crime scene, an absurd assertion that would have prompted reasonable defense counsel to explore her possible role in the crime and cast doubt on the thoroughness and rigor of the police investigation, which failed to meaningfully probe Columbo's reasons for making such a specious claim.

273.    The notes also documented that a Burkhart-Roentgen employee had heard Mr. Carr say of Richard Burkhart, "I hate that SOB. Before I leave I'm going to punch that bastard." The suppression of the notes deprived defense counsel of the opportunity to use this statement as further support for an alternative theory that the murder resulted from personal animosity involving Columbo, Burkhart, and Carr.

### F.  The Towel Fabrication

274.    Even with the falsified new "evidence" and the hidden exculpatory evidence, the emerging case against Ricky and Shawn still had a glaring flaw: How did homeless teenagers who slept in a stolen car walk out of one the goriest crime scenes in recent memory without a trace of the victim's blood anywhere on either of them?

275.    To help solve that problem for the State, Dr. Henry Lee, then the Director of the Connecticut State Police forensic laboratory, fabricated still more evidence.

276.    When police processed the crime scene, they photographed a bathroom upstairs in which two towels were hanging next to the sink. One of the towels appeared to have a stain of some kind on it.

277.    On a date and time not presently known, Lee told the prosecutor on the case that he had tested the bathroom towels and that one of the towels had tested positive for blood.

278.    These statements were false, and Lee knew they were false.

279.    In post-conviction proceedings, other state lab personnel testified that Lee **never** tested the towels. Having never tested them, he never got a positive result for blood on one of them. Lee knew as much when he told the prosecutor he had.

280.    Lee's fabrication about the towel was integral to Shawn's unlawful conviction. As the Supreme Court of Connecticut later explained in overturning the conviction, "the prosecutor's greatest challenge at trial was to explain how it was possible for two teenagers to have stabbed the victim twenty-seven times in the confines of a narrow hallway, severed his jugular vein, struck him over the head several times, tracked blood all over the house, and yet somehow managed not to leave any trace evidence in their getaway vehicle—which, as we previously discussed, did not show any signs of having been cleaned when the police recovered it a few days later—or elsewhere." *Henning v. Commissioner of Corr.*, 334 Conn. 1, 32 (2019).

281.    Lee's fabrication supplied an explanation:  Shawn had washed blood off of himself and dried himself with the towel. As a result, Shawn was convicted of a crime he did not commit.

282.    This was not the first or the only time that Lee forwarded false information to prosecutors that was later used to convict an innocent person.

283.   According to published media reports, Lee "has allegedly hidden evidence or given incorrect testimony in at least three other cases, potentially sending the wrong men to prison"[1]—just as he did to Shawn Henning and Ricky Birch.

284.   For instance, in one case in 1988, Lee testified that a brown substance found on a knife belonging to murder suspect was blood. Although Lee testified that it could not be determined whether the blood was human in origin, in fact laboratory testing conducted prior to the trial had already shown that the substance was definitively *not* human blood.

285.   In another case, Lee testified that blood spatter found on a murder defendant's pants matched his slain wife's blood type. In fact, it now appears that the victim's blood type was never found on the pants.

286.   Only by fabricating evidence supporting their incredible "burglary gone bad" theory and suppressing evidence that undermined it were Defendants able to secure Shawn Henning's conviction.

**IV. The Flimsy Case Against Shawn Henning and Its Eventual Collapse**

287.   Shawn was arrested for the murder of Everett Carr on November 18, 1988 at gun point by Ocif.

288.   He was charged with felony murder and burglary. He pleaded not guilty.

289.   The case proceeded to trial just five months after the arrest.[2]

---

[1]   Natalie O'Neill, "How Many Murder Cases Did Celeb Forensic Scientist Henry Lee Botch?," *The Daily Beast* (June 26, 2019), https://www.thedailybeast.com/henry-lee-how-many-murder-cases-did-the-celebrity-forensic-scientist-botch.

[2]   Shawn Henning was tried separately and convicted before Ricky's trial began.

## A. An Unjust Conviction

290.    The State had no eyewitnesses placing Shawn at the scene of the crime. It had no forensic evidence connecting Shawn to the crime. In fact, all of the forensic evidence indicated that he was not involved in the crime.

291.    The State's extremely weak trial case against Shawn had five basic parts:

292.    **First**, the car. Ricky and Shawn were concededly driving the loud Buick with the missing muffler on the night of December 1-2, 1985. Two neighbors testified that they heard some unspecified loud car near the Carr residence between 12:10 and 12:30 am on the night of the murder. They did not see the car or hear its doors open or close.

293.    One of these neighbors claimed to have heard the noise of the car toward the end of watching the *The Tonight Show* with Johnny Carson, which aired from 11:30 p.m. to 12:30 a.m. However, subsequent investigation showed that *The Tonight Show* did not air on the evening of December 1, 1985, and that the neighbor therefore must have recalled hearing a loud noise on a different night, not the night of the murder.

294.    Another neighbor testified in Ricky's trial, but not Shawn's, that he had both seen and heard the loud car on the night in question, and, upon being shown a photograph of the Buick, stated that it was ***not*** the car he observed.

295.    **Second**, Ricky, Shawn, and Tina's statements about their whereabouts on the night in question. The State made much of the fact that Ricky, Shawn, and Tina initially misled the police about their whereabouts on the night of December 1-2, 1985. But those misleading statements were immediately corrected and were meant to conceal that they had stolen the Buick. The police knew all of that within 72 hours of the murder.

296.     The State also focused on inconsistent statements about the timing. According to Tina Yablonski's testimony, which was inconsistent with her undisclosed prior statement to police, she, Ricky, and Shawn left Danbury shortly after 11:00 p.m. on the night of the murder.

297.     According to the State, this testimony not only showed that it was logistically possible for Ricky to have committed the crime, but also suggested consciousness of guilt—that Ricky lied to police about the timing of his departure from Danbury to conceal that he committed the murder. But Defendants' suppression of Tina's pre-polygraph interview deprived the defense of a crucial area of cross-examination.

298.     **Third**, the falsified December 1985 interrogations. Police witnesses falsely testified that, during these interrogations, Shawn said that he knew the victim had tattoos and that Shawn, Ricky, and Tina may have turned around in the victim's driveway.

299.     **Fourth**, the fabricated testimony of Mildred Henning and Timothy Saathoff. Without any way of knowing about the suppressed evidence that $1,000 in cash had been left undisturbed at the crime scene, the defense was impeded from demonstrating that the "burglary gone bad" theory was incredible.

300.     **Fifth**, the junk science, which served not to inculpate Shawn but to explain away the otherwise inexplicable lack of forensic evidence against him. Lee testified that the blood spatter on the walls was "uninterrupted," meaning that no person or object was between the victim's body and the wall when the spatter occurred.

According to Lee, this meant that it was possible for the attackers to have committed the crime without getting significant amounts of blood on them.[3]

301.    Lee also falsely testified that blood had been found on the towel in the upstairs bathroom in the Columbo residence. Lee testified: "The last slide [photograph] shows a portion of the view of upstairs bathroom. On this towel have reddish color smear. *That smear, I did a few tests, show that it positive consistent with blood*."

302.    In attempting to convince the jury of Shawn's guilt in his closing argument, the prosecutor relied heavily on the evidence fabricated by Defendants.

303.    All of that evidence--except that Shawn was driving around in the noisy stolen Buick and initially lied about it--was either fabricated by the police or contradicted by *Brady* material suppressed by the police.

304.    The prosecutor discussed the December 1985 interrogations at length in his summation, arguing that Mr. Henning's statements to McCafferty and O'Mara placed him at the homicide scene.  First, the prosecutor pointed to McCafferty's fabricated testimony "Recall if you will Detective McCafferty. He testified that he conducted an interview with the defendant on December 9th. Now, there are three interviews**;** December 4, December 5 and December 9. He testified that he conducted an interview with the defendant on December 9. He inquired about his movements on the night of December 1st. He challenged the defendant on his possession of a noisy car. He told them the noisy car had been in the neighborhood. What happened? The defendant

---

[3]    This testimony was, of course, nonsense. There was no possibility that the attackers could stab Carr 27 times in a dynamic struggle in close quarters without getting bloody themselves.

starts to shake his leg violently, and what does he say? 'We may have turned around in the driveway.'"

305.    Next, the prosecutor highlighted O'Mara's fabricated evidence: "Remember the testimony of Sergeant O'Mara, backing up a day? This had been in the interview. One of the things O'Mara did is show him a photograph [of the victim]. Look at this photograph, ladies and gentlemen. What does the defendant do? He says to O'Mara 'isn't that the guy with the tattoos? I may have seen him downtown.' I submit to you ladies and gentlemen, that he didn't see the tattoos downtown. He saw those tattoos at the time of the murder, when Mr. Carr was attacked in his home and he's covered with tattoos on his hand, his arms, his shoulders and his wrists."

306.    The prosecutor also twice reminded the jury of Lee's fabricated assertion that there was blood on the towel in the upstairs bathroom. He stated: "Remember the **bloody towel** in the upstairs bathroom.  It gave them an opportunity to wash." Indeed, the prosecutor underscored the significance of the false evidence arguing elsewhere: "Significant, also, is what Dr. Lee testified to about the upstairs bathroom and the towel with the blood on it."

307.    The jury eventually found Shawn guilty of felony murder. He was sentenced to 50 years in prison.

### B. New, Definitive Evidence Proves That Ricky and Shawn Are Innocent

308.    After Ricky and Shawn spent decades in prison for a crime they did not commit, a thorough post-conviction investigation proved their innocence.

309.    Extensive DNA testing conducted between 2008 and 2015 compared items seized from the crime scene to the belongings of Ricky, Shawn, and Tina. The DNA

results show that Carr's DNA was not found on any of Ricky or Shawn's clothing or other belongings.

310.     Numerous items from the crime scene were tested and found to bear DNA. Testing excluded Shawn, Ricky, and Tina as contributors of that DNA.

311.     Four items—a blood smear on the White Owl cigar box from Carr's dresser, blood from a floorboard where the perpetrator left a footprint next to Carr's body, the waistband of Carr's bloody underwear, and the knife collar found under Carr's body—were each shown to contain a mixture of Carr's DNA and that of another person. That person is not Tina, Shawn, or Ricky, and has never been identified.

312.     It is overwhelmingly likely that the second DNA profile found on these four items belongs to Everett Carr's real killer.

313.     A latent fingerprint recovered from the crime scene has never been matched to any known individual. It may also belong to the real killer.

314.     Post-conviction forensic analysis also established that two shoe impressions found at the crime scene—which the State acknowledged belonged to the perpetrators—did not match the shoes that Ricky and Shawn wore at the time.

315.     William Bodziak, a former FBI footwear impression analyst, also concluded that at least one of the sets of footprints left by Carr's murderers was far too small to match either Shawn's feet or Ricky's feet.

316.     Timothy Saathoff also recanted his fabricated statements implicating Shawn in the murder, and admitted that he lied when he claimed that Shawn had confessed to him, believing that he would be helping him due to Ocif's manipulative lies.

317.     The post-conviction reinvestigation also uncovered evidence from John Andrews, who was Diana Columbo's boyfriend at the time of Shawn's trial in 1989.

318.    Andrews testified that Columbo once charged at him with a knife during an argument and threatened to kill him like she had killed her father.

319.    Shortly after receiving these threats from Diana Columbo, Andrews was brutally assaulted and nearly murdered while playing cards at the Aspetuck Avenue house. He believed that Columbo had orchestrated the attack.

320.    While packing his belongings to leave Columbo's home, Andrews discovered the blade of a knife with its handle missing hidden away in the basement. The knife used to murder Carr almost certainly snapped in half, as demonstrated by the knife collar found under his body.

321.    In short, the entirety of the State's extremely flimsy case against Shawn and Ricky has been soundly discredited.

### C. Shawn Is Finally Exonerated and the Charges Dismissed

322.    After lengthy post-conviction proceedings in State court, Shawn's conviction was finally overturned by the Supreme Court of Connecticut on June 14, 2019.

323.    The Supreme Court ruled that Lee's false testimony about finding blood on the bathroom towel, and the prosecution's failure to correct it, violated Shawn's right to a fair trial. It ordered that he be granted a new trial.

324.    After the State concluded that there was insufficient evidence to permit a retrial, the Connecticut Superior Court dismissed all of the charges against Shawn on July 10, 2020, finally ending his three-decade ordeal.

325.    In explaining the State's decision not to retry the case, the State's Attorney represented to the court that there were "significant obstacles to the State's ability to prove the case beyond a reasonable doubt," including "the lack of forensic evidence

establishing a link between [Shawn] and the crime scene, despite the most recent testing and retesting completed by the Connecticut Forensic Laboratory" and the recantation of Timothy Saathoff, whom the State characterized as a "material witness."

## V. 30 Years Lost

326.    As a result of Defendants' misconduct, Shawn Henning spent approximately 30 years incarcerated for a murder of which he was completely innocent.

327.    Shawn has been publicly shamed, disgraced, and humiliated because of the ordeal of being falsely accused and convicted of a gruesome murder. Nothing can undo the reputational damage he has sustained.

328.    Shawn's wrongful conviction and incarceration violated his fundamental constitutional rights. This action seeks damages for the period from November 18, 1988, through each and every year to the present, and continuing into the future. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and negligent acts and omissions caused Mr. Henning to be wrongly seized, wrongfully convicted, falsely imprisoned, and forced to serve decades of prison time for a crime he did not commit.

329.    Defendants' unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions caused Mr. Henning the following injuries and damages, which were foreseeable to Defendants at the time of their acts and omissions: physical injuries (including being stabbed in the chest with a shiv by another inmate); pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not

limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fabrication of Evidence in Violation of the Right to a Fair Trial
(Against Defendants Ocif, O'Mara, McCafferty, and Lee)

330.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

331.    At all relevant times, Ocif, O'Mara, McCafferty, and Lee acted under color of law in investigating Plaintiff for the murder of Everett Carr.

332.    Defendants fabricated evidence against Plaintiff, and/or failed to intervene to prevent the fabrication of evidence against Plaintiff despite having knowledge of the fabrication and a reasonable opportunity to intervene.

333.    The fabricated evidence includes but is not limited to the invented self-inculpatory "turning in the driveway" and knowledge of the victim's "tattoos" statements, the false secondary confessions attributed to Mrs. Henning and Mr. Saathoff, and the fabricated positive test for blood on the bathroom towel.

334.    This evidence was likely to, and ultimately did, influence the jury's verdict finding Plaintiff guilty.

335.    Defendants forwarded this fabricated evidence to prosecutors, who presented it to the jury that convicted Plaintiff.

336.    Plaintiff was wrongfully convicted and incarcerated as a result.

337.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct towards Plaintiff.

338.    Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Malicious Prosecution in Violation of the Fourth Amendment
(Against Defendants Ocif, Acker, McCafferty, and O'Mara)

339.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

340.    Defendants Ocif, Acker, McCafferty, and O'Mara initiated criminal proceedings against Plaintiff by generating false evidence against him and providing it to prosecutors and/or failing to intervene to prevent the presentation of such false and fabricated evidence.

341.    The proceedings terminated in Plaintiff's favor when all charges against him were dismissed.

342.    There was no probable cause for the criminal proceedings against Plaintiff, which were based almost entirely on fabricated and patently unreliable evidence.

343.    As demonstrated by their gross deviations from acceptable police procedures and their intentional fabrication of evidence, Defendants Ocif, Acker, McCafferty, and O'Mara acted with malice in pursuing criminal proceedings against Plaintiff.

344.    Plaintiff was wrongfully convicted and incarcerated as a result.

345.   Defendants Ocif, Acker, McCafferty, and O'Mara acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct towards Plaintiff.

346.   Defendants Ocif, Acker, McCafferty, and O'Mara's wrongdoing proximately caused the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION

42 U.S.C. § 1983 – Suppression of Material Favorable Evidence / *Brady v. Maryland*
(Against Defendants Town of New Milford, Graham, Jordan, Quartiero, Ocif, and Acker)

347.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

348.   Defendants Graham, Jordan, Quartiero, Ocif, and Acker acted under color of state law in investigating Plaintiff for murder.

349.   In the course of the investigation, these Defendants uncovered and/or learned of evidence favorable to Plaintiff, including (a) that $1,000 in cash was left undisturbed at the victim's residence, undermining the theory that the crime was a burglary gone wrong; (b) that Tina Yablonski told police during a March 4, 1986 pre-polygraph interview that she, Ricky, and Shawn had departed Danbury at 12:25 a.m. on the night of the murder and therefore could not have been present when the victim's neighbors heard a loud car in the area; (c) the crime scene video showing, among other things, that Diana Columbo's bedroom was undisturbed; and (d) that, before changing her story, Yablonski was offered immunity from prosecution for any role she might have played in a New Hampshire burglary.

350.    This evidence was material and would likely have led to an outcome more favorable to Plaintiff in the criminal proceedings against him.

351.    Defendants suppressed this evidence by not disclosing it to prosecutors, thereby preventing it from reaching Plaintiff or his defense counsel, and/or failed to intervene to prevent the suppression of this evidence despite having knowledge of the suppression and a reasonable opportunity to intervene.

352.    Plaintiff was wrongfully convicted and incarcerated as a result.

353.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct towards Plaintiff. Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983–Civil Rights Conspiracy
(Against Defendants Ocif, O'Mara, McCafferty, Acker, Jordan, Quartiero, Graham, and Lee)

354.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

355.    The Defendants, Ocif, O'Mara, McCafferty, Acker, Jordan, Quartiero, Graham, and Lee, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Henning of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

356.    In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including without limitation the following:

a.  Suggesting and/or fabricating inculpatory evidence in the form of Defendant McCafferty's report, Defendant O'Mara's report, Defendant Ocif's reports; Mrs. Henning's statement, Mr. Saathoff's statement, and Defendant Lee's false evidence that he had tested and found blood on the towel at the crime scene; and

b.  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* evidence during the pendency of the case, including without limitation: the recovery of $1,000 in large bills from the crime scene; recording of a pre-polygraph interview with Tina Yablonski in which she confirmed that Ricky and Shawn could not have been in New Milford at the time the State accused them of being there; and video footage of the crime scene; and

c.  Wrongfully prosecuting Mr. Henning while knowing they lacked probable cause.

357.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Henning's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Henning's wrongful arrest, prosecution, conviction, and incarceration.

**FIFTH CAUSE OF ACTION**
42 U.S.C. § 1983–Failure to Intervene
(Against Defendants Ocif, O'Mara, McCafferty, Acker, Jordan, Quartiero, and Graham)

358.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

359.    By their conduct and under color of state law, Defendants Ocif, O'Mara, McCafferty, Acker, Jordan, Quartiero, and Graham had opportunities to intervene on behalf of Mr. Henning to prevent his malicious prosecution, lack of a fair trial and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

360.    These Defendants' failures to intervene violated Mr. Henning's clearly established constitutional rights to not be maliciously prosecuted, denied a fair trial and deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1985-1988 would have believed that failing to intervene to prevent Defendants from fabricating evidence, feeding facts to, manipulating, rewarding, and coercing alleged witnesses to fabricate evidence, withholding material exculpatory evidence, and deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Henning to be arrested and prosecuted without probable cause, were lawful.

361.    These Defendants knew, or should have known, that their conduct would result in Mr. Henning's wrongful arrest, prosecution, conviction, and incarceration. As a direct and proximate result of the Defendants' failures to intervene, Mr. Henning was wrongly convicted and imprisoned for thirty years and suffered the other grievous and continuing injuries and damages as set forth above.

## SIXTH CAUSE OF ACTION
Negligence
(Against Defendants Ocif, O'Mara, McCafferty,
Jordan, Quartiero, Graham, Acker, and Lee)

362.    Plaintiff repeats and realleges the above paragraphs as if the same were fully
set forth at length herein.

363.    Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker,
and Lee owed Plaintiff a duty to exercise reasonable care in their investigation of crimes,
to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating
evidence and pursuing criminal prosecutions without sufficient basis.

364.    Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker,
and Lee breached these duties by their conduct set forth above.

365.    The negligent acts and omissions of Defendants Ocif, O'Mara, McCafferty,
Jordan, Quartiero, Graham, Acker, and Lee proximately caused the damages
hereinbefore alleged.

## SEVENTH CAUSE OF ACTION
Negligent Infliction of Emotional Distress
(Against Defendants Ocif, O'Mara, McCafferty,
Jordan, Quartiero, Graham, Acker, and Lee)

366.    Plaintiff repeats and realleges the above paragraphs as if the same were
fully set forth at length herein.

367.    Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker,
and Lee negligently and grossly negligently, and in breach of their duties owed to
Plaintiff to refrain from fabricating evidence, manipulating witnesses, withholding
material exculpatory evidence, and otherwise acting to deny him due process of law,
directly and proximately caused Plaintiff, who was innocent, to be falsely arrested,
maliciously prosecuted, and wrongly imprisoned for thirty years. Defendants Ocif,

O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker, and Lee's actions directly and proximately caused the grievous and continuing injuries and damages set forth above.

368.   Plaintiff suffered severe and extreme emotional distress, anxiety, and physical and mental harm which were reasonable and foreseeable in light of the conduct of Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker, and Lee.

369.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

**EIGHTH CAUSE OF ACTION**
Intentional or Reckless Infliction of Emotional Distress
(Against Defendants Ocif, O'Mara, McCafferty,
Jordan, Quartiero, Graham, Acker, and Lee)

370.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

371.   Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker, and Lee, in investigating Plaintiff and pursuing the criminal prosecution of Plaintiff, as set forth above, intended, recklessly disregarded or knew or should have known that their conduct would cause emotional distress and that such distress might result in illness or bodily harm.

372.   The Defendants' conduct was extreme and outrageous.

373.   Plaintiff suffered severe and extreme emotional distress anxiety, and physical and mental harm which were reasonable and foreseeable in light of the conduct of Defendants Ocif, O'Mara, McCafferty, Jordan, Quartiero, Graham, Acker, and Lee.

374.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## NINTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 7-465
(Against Defendant Town of New Milford)

375.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

376.     Defendant Jordan, was a police officer acting in the performance of his duties within the scope of his employment with Defendant Town of New Milford and under color of law.

377.    As set forth above, Jordan infringed Plaintiff's civil rights and caused him physical damages to his person and property while performing his duties and acting within the scope of his employment.

378.    As a direct and proximate result of his conduct, Plaintiff suffered the damages hereinbefore alleged.

379.    Within six months after the foregoing causes of action accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the Town of New Milford written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

380.    Pursuant to the Third, Fourth, Fifth, Sixth, Seventh and Eighth Causes of Action, Defendant Town of New Milford is liable for Plaintiff's damages under Conn. Gen. Stat. § 7-465.

## TENTH CAUSE OF ACTION
Direct Action – Conn. Gen. Stat. § 52-557n
(Against Defendant Town of New Milford)

381.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

382.    Defendant Jordan was a police officer acting in the performance of his duties within the scope of his employment with Defendant Town of New Milford and under color of law.

383.    Jordan owed Plaintiff a duty to exercise reasonable care in his investigation of crimes, to reasonable pursue and disclose exculpatory evidence, to refrain from fabricating evidence, and/or to intervene to prevent other law enforcement officers from engaging in such misconduct.

384.    Jordan breached these duties by his conduct set forth above.

385.    Even to the extent that Jordan was performing discretionary functions, he disregarded the risk of imminent harm to Plaintiff, an identifiable person.

386.    In addition, or in the alternative, the actions of Jordan involved malice, malicious intent to vex or trouble, and/or intent to injure.

387.    As a direct and proximate result of his conduct, Plaintiff suffered the damages hereinbefore alleged.

388.    Defendant Town of New Milford is liable for those damages under Conn. Gen. Stat. § 52-557n.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.      An order awarding Plaintiff reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988, Connecticut common law and the inherent powers of this Court; and

5.      Such other further relief as the Court may deem just and proper.

Dated: December 2, 2020

SHAWN HENNING, PLAINTIFF


_____/s/_____
Craig A. Raabe (ct04116)
Izard, Kindall & Raabe, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Direct: (860) 513-2939
Fax:  (860) 493-6290
Email: craabe@ikrlaw.com

W. James Cousins (ct06382)
54 Danbury Road, Suite 413
Ridgefield, CT 06877
Tel. No.: (203) 205-0622
Email: jcousins@wjcousinslaw.com